FILED
2020 Nov-23  AM 10:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RHONDA HAGGARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:19-CV-01111-AKK** |
| | ) | |
| **DOROTHY MONTGOMERY,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Rhonda Haggard brings this action against Dorothy Montgomery, who represents the estate of her deceased husband, George Montgomery, and against Lindsay Bumpers. Both George Montgomery and Bumpers were police officers working for the City of Tarrant, Alabama, during the events that produced this lawsuit. Officers Montgomery and Bumpers encountered Haggard at her home in January 2019 while responding to a domestic violence call that Andre Lee, Haggard's husband, placed from the residence. After an argument with his wife, Lee falsely reported that Haggard was using a knife to hold him hostage. Officers Montgomery and Bumpers arrived soon after. Although the officers did not see a knife and the couple appeared calm, they nonetheless decided to detain Haggard. Officer Bumpers then tackled Haggard from behind and struck her in the face.

1

Meanwhile, Officer Montgomery tased Haggard twice, including once while she was allegedly handcuffed.

Haggard later filed this lawsuit under 42 U.S.C. § 1983, alleging that the officers used excessive force against her in violation of the Fourth Amendment. The court has for consideration the officers' motion for summary judgment, contending they are entitled to the defense of qualified immunity. Officer Bumpers seeks a full judgment against Haggard. Officer Montgomery seeks a partial judgment ruling only that he is entitled to immunity for the first time that he tased Haggard. For the reasons explained below, the motion is due to be denied.

## I.

Haggard and Lee have resided in their home in Tarrant, Alabama with their two children for roughly four years. Doc. 36 at 14:13–15:18, 22:5–14 (Ex. A).[1] During that time, Haggard and Lee have called Tarrant police to their residence on several occasions to address episodes of domestic violence and arguments. *Id.* at 50:9–51:3 (Ex. A). Although Lee does not drink alcohol, those calls generally occurred after Haggard had imbibed. *Id.* at 52:10–19 (Ex. A). Some of those calls resulted in police officers arresting either Haggard or Lee. *Id.* at 32:1–12, 55:6–56:2

---

[1] The defendants submitted evidentiary material, including several deposition transcripts, to support their motion. Doc. 36. Although the exhibits are listed separately, they appear as one document on the court's docket. *See id.* Accordingly, when citing this evidentiary material, the court will list the page number in the docket and then designate the exhibit. For deposition transcripts, the court will cite the transcript page number and the exhibit.

(Ex. A).  But before 2019, none of those occasions produced allegations of police misconduct.  *Id.* at 56:3–56:16 (Ex. A).

Shortly before 11:10 p.m. on January 23, 2019, Haggard and Lee had another argument resulting in police officers visiting their home.  *See id.* at 150–151 (Ex. G).  The two "said a couple of words to each other," but they did not physically fight. *Id.* at 82:11–83:1 (Ex. A).  Haggard acknowledged that she "probably had a little sip" and smelled like alcohol, but she denied being more than mildly inebriated.  *Id.* at 83:5–84:9 (Ex. A).  Lee agreed with his wife's assessment.  *Id.* at 33:3–22 (Ex. B).  After the argument, Lee secretly called the police, reporting that Haggard was threatening him with a knife.  *Id.* at 29:15–30:16 (Ex. B).  Dispatch logs from the Tarrant Police Department succinctly summarize Lee's call: "RHONDA HAGGARD HOLDING KNIFE ON HIM AND WILL NOT LET HIM LEAVE RESIDENCE."  *Id.* at 151 (Ex. G).  Haggard adamantly denies threatening Lee with a knife, however.  *Id.* at 86:3–12 (Ex. A).  And Lee later admitted to lying about the knife so that officers would take the call seriously.  *Id.* at 34:13–22 (Ex. B).

The Tarrant Police Department responded accordingly, dispatching Officers Montgomery and Bumpers to Haggard and Lee's home at 11:11 p.m.  *Id.* at 150 (Ex. G).  They arrived separately on the scene less than five minutes later and announced themselves as Tarrant police from a side door.  *Id.* at 19:4–15 (Ex. C); 150 (Ex. G). It was dark outside and a light emanating from a back room dimly lit the home's

interior.  *Id.* at 82:4–20 (Ex. C).  Lee eventually answered the door and told the officers that "the situation was handled" and that they did not need assistance.  *Id.* at 52:13–21 (Ex. B).  The officers never asked Lee about a knife, and Lee never told them that his wife was armed.  *Id.*  Even so, Lee agreed to follow the officers outside to talk.  *Id.* at 53:6–12 (Ex. B).

Haggard then noticed the officers and asked them why they were there.  *Id.* at 96:12–23 (Ex. A).  She confirmed to the officers that nothing was wrong and that she and Lee did not need assistance.  *Id.* at 96:22–97:16 (Ex. A).  The "mood changed" and Haggard became visibly angry, though not aggressive, when the officers refused to believe her.  *Id.* at 97:17–98:6 (Ex. A).  Officer Montgomery, who was standing behind Officer Bumpers, unholstered his taser and tapped Officer Bumpers' back.  *See id.* at 98:1–6 (Ex. A); 53:14–23 (Ex. B).  Lee thought Officer Montgomery drew a gun and exclaimed, "[W]hy you got a gun out, man? I will come out here and talk to you, it ain't that serious."  *Id.* at 51:7–12 (Ex. B).  Overhearing Lee, Haggard turned toward him and stepped away from the officers as if she were walking to another room.[2]  *Id.* at 98:15–18, 107:1–8 (Ex. A); 57:1–10 (Ex. B).

---

[2] Officer Bumpers testified that she heard Lee say to Haggard, "Yes, you did have a knife on me," when Haggard turned toward him.  Doc. 36 at 23:1–5, 89:5–14 (Ex. C).  In their reply brief, the defendants contend that this testimony "stands uncontradicted by any record evidence."  Doc. 42 at 3.  But Haggard does not mention Lee making any such statement when she describes this moment.  *See id.* at 98:15–99:10 (Ex. A).  And Lee says Officer Bumpers immediately charged into his home after he questioned why Officer Montgomery had unholstered his taser.  *Id.* at 51:10–21, 53:18–54:1 (Ex. B).  The court considers this a disputed fact that it must resolve in Haggard's favor at summary judgment.

4

Officer Bumpers, who smelled alcohol on Haggard's person, believed Haggard was dangerous and might be reaching for a weapon based on Lee's call. *Id.* at 23:10–24:2, 85:12–15, 94:16–21 (Ex. C).  While Haggard faced Lee, Officer Bumpers rushed into their home and lunged at Haggard from behind without providing any verbal warning.  *Id.* at 98:19–99:3 (Ex. A).  Though unsteadied, Haggard remained upright and turned toward Officer Bumpers.  *Id.* at 99:1–10, 103:15–19 (Ex. A).  Officer Bumpers then struck Haggard in the face and shoved her.  *Id.* at 99:1–10 (Ex. A).  The two were stumbling when Officer Montgomery, who was smoking a cigarette, tased Haggard, striking her side.  *Id.* at 99:1–10, 116:13–117:19, 167:15–23 (Ex. A).  Haggard and Officer Bumpers fell together, rolling off a pool table before bouncing to the floor with Haggard landing face down. *Id.* at 99:11–14, 117:20–118:18 (Ex. A).  Haggard denies resisting or purposefully hitting either officer but says she "could have accidentally touched them" while she fell.  *Id.* at 104:16–20; 105:17–19, 167:6–14, 180:9–18 (Ex. A).

What happened next is unclear.  In Lee's words, there "was a lot of commotion going on."  *Id.* at 57:17–23 (Ex. B).  Eventually, Officer Bumpers recovered from the fall and used her knees to pin Haggard to the ground before handcuffing her.  *Id.* at 99:14–18 (Ex. A).  Meanwhile, and roughly ten seconds after he tased Haggard

initially, Officer Montgomery tased Haggard again while she was down.[3]  *Id.* at 144 (Ex. E).  Haggard's husband and children watched as this occurred.  *Id.* at 57:17–23 (Ex. B).  Haggard alleges that she was already handcuffed and compliant when Officer Montgomery tased her the second time.  *Id.* at 120:14–22, 124:4–19 (Ex A).  But Officer Bumpers says that Haggard was resisting arrest and not yet handcuffed.  *Id.* at 31:20–32:7 (Ex C).

After restraining Haggard, the officers asked her to stand.  Doc. 36 at 128:21–23 (Ex. A).  Haggard struggled to rise because her hands were handcuffed behind her back and because she has preexisting knee problems.  *Id.* at 128:23–129:4, 169:17–170:3 (Ex. A).  Accordingly, the officers lifted Haggard to her feet and placed her in Officer Montgomery's patrol car.[4]  *Id.* at 130:4–8, 131:21–132:3 (Ex. A).  The officers neither searched for nor found a knife in the residence before escorting Haggard outside.  *Id.* at 100:9–17 (Ex. C).  Officer Montgomery then drove Haggard to jail, where they arrived at 11:30 p.m.—roughly twenty minutes after the

---

[3] Haggard and Lee testified that Officer Montgomery tased Haggard more than twice.  Doc. 36 at 110:2–10 (Ex. A).  Haggard alleged that Officer Montgomery tased her three times—twice while on the ground and handcuffed.  Lee placed the number at up to five times.  *Id.* at 59:13–18 (Ex. B).  But the defendants submitted a declaration establishing that Officer Montgomery used his taser only twice on January 23, 2019.  *Id.* at 144 (Ex. E).  And Haggard's amended complaint alleges only that Officer Montgomery tased her twice that night.  Doc. 19 at 3 ¶¶ 18–22, 28.

[4] Haggard also alleges that Officer Montgomery kicked her while she struggled to stand.  Doc. 19 at 3 ¶ 23; doc. 36 at 127:13–21, 128:12–16, 129:1–5 (Ex. A).  Officer Bumpers denies this allegation.  Doc. 36 at 57:17–19 (Ex. C).  Because Haggard does not claim that the alleged kicks contributed to an excessive use of force, *see* doc. 19 at 4 ¶ 28, the court need not address this issue.

Tarrant Police Department received Lee's initial call and fifteen minutes after the officers first arrived at the residence. *Id.* at 153:2–5 (Ex. A); 150 (Ex. G). At jail, Haggard was charged with resisting arrest, *id.* at 41:2–15 (Ex. A), to which she later pleaded guilty, *id.* at 141 (Ex. D).

Haggard spent the night in jail before Lee bailed her out the next day. *Id.* at 41:11–42:6 (Ex. A); 73:13–18 (Ex. B). She emerged with a swollen and scratched eye, which she attributed to Officer Bumpers striking her in the face the night before. *Id.* at 151:1–152:20 (Ex. A); *see also* doc. 37 at 4 (Ex. H). Soon after her release, Haggard summoned the Tarrant Fire Department to her home because she "was still feeling irregular" and had not yet seen a doctor. Doc. 36 at 58:15–59:4 (Ex. A). Firefighters suggested that Haggard ride with them to the hospital to address her elevated blood pressure, but she refused because that required leaving her children unattended. *Id.* at 61:13–21 (Ex. A). Haggard went to the emergency room later that evening, but she left without seeing a doctor because the line was long, and she was feeling better. *Id.* at 61:22–62:23 (Ex. A).

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56. A genuine dispute of material fact exists if a "reasonable jury could return a verdict for the nonmoving party" under the governing

7

law.  *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotation omitted).  When resolving a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmovant.  *Id.*

## III.

Haggard filed this lawsuit under 42 U.S.C. § 1983, asserting excessive force claims against both officers.  Doc. 19 at 1.  Specifically, Haggard alleges that because she was not resisting when the officers arrested her, it violated the Fourth Amendment both for Officer Montgomery to tase her twice, including once while she was allegedly handcuffed, and for Officer Bumpers to strike her in the face.  *Id.* at 4–6.  The officers moved for summary judgment, each raising the defense of qualified immunity.  Doc. 34.  Officer Bumpers seeks a complete judgment in her favor.  *Id.* at 3.  Officer Montgomery, in contrast, seeks only a partial judgment ruling that he is immune from liability for the first time that he tased Haggard.  He concedes "that a genuine issue of material fact exists as to whether Haggard was handcuffed and still resisting arrest" when he tased her again.  Doc 34 at 2 n.2.  Therefore, he does not seek summary judgment "on that lone part of Haggard's claim."  *Id.*

### A.

"Qualified immunity shields public officials from suits against them in their individual capacities for torts committed while performing discretionary duties unless the tortious act violates a clearly established statutory or constitutional right."

*Zivojinovich v. Barner*, 525 F.3d 1059, 1071 (11th Cir. 2008).  The doctrine "applies to police officers partly because the law recognizes that they do an important and necessary—but sometimes dangerous—job on the public's behalf."  *Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1337 (11th Cir. 2020).  Officers must often "rely on imperfect information to make snap judgments that can sometimes be the difference between life and death."  *Id.*  Qualified immunity thus renders immune "all but the plainly incompetent or one who is knowingly violating the federal law."  *Id.* at 1338 (quotation omitted).

But as its name implies, this immunity doctrine is not absolute.  The "snap judgments" officers make "must be reasonable to fall within qualified immunity's ambit."  *Id.* at 1337.  In other words, the doctrine does not protect an officer who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate" a constitutional right.  *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (quotation and emphasis omitted).  Qualified immunity thus balances "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [them] from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

## B.

The first step in the analysis is to determine whether the officers acted within

the scope of their discretionary authority when the challenged conduct occurred. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Here, that is undisputed, so the burden shifts to Haggard to show that the officers violated a constitutional right and that the right was clearly established when the officers arrested her. *Id.* Courts can consider those issues in either order, but the "traditional approach," which the court will follow, is to start with whether the officers violated Haggard's constitutional rights. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

### 1.

The Fourth Amendment protects citizens from unreasonable searches and seizures, which "encompasses the right to be free from excessive force during the course of a criminal apprehension." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). Courts analyze claims that officers have violated that right using the Fourth Amendment's "objective-reasonableness standard." *Patel*, 959 F.3d at 1338. That standard requires courts to consider whether the officers' conduct was "objectively reasonable in light of the facts confronting" them. *Id.* (quotation omitted). When assessing reasonableness, courts should not substitute their judgment for that of "a reasonable officer on the scene." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Indeed, the "only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski*, 573 F.3d at 1166 (citing

10

*Graham*, 490 U.S. at 396).

Whether an officer used a reasonable amount of force depends on "(1) the severity of the crime; (2) whether the individual posed an immediate threat to the safety of the officers or others; and (3) whether the individual actively resisted arrest or attempted to evade arrest by flight." *Patel*, 959 F.3d at 1339 (alteration and quotation marks omitted) (quoting *Graham*, 490 U.S. at 396). The Eleventh Circuit has also considered "(4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury." *Id.* Applying that framework, the court will analyze the excessive force claims against Officers Bumpers and Montgomery separately according to their individual actions. *See Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

**a.**

Officers Bumpers and Montgomery were dispatched to Haggard's home to address a claim that Haggard was wielding a knife and holding Lee hostage—a serious allegation, no doubt. Haggard contends, however, that "[t]here is no evidence that there even was a crime" when the officers arrived at her home. Doc. 39 at 19. Moreover, she notes that Lee later admitted to lying about the knife. *Id.* She has a point. Both Haggard and Lee repeatedly told the officers that everything was fine and that they needed no assistance. Moreover, the officers never asked Lee about the knife when they arrived on the scene. To be sure, Lee had not yet recanted

his claim that Haggard was armed when the officers questioned him that night.  But the fact that the officers never asked about or searched for a knife in the home—despite being dispatched there for a purported hostage situation—underscores that they had little reason to believe a serious crime was occurring.

That does not end analysis of the first factor, however.  Haggard's plea to the resisting arrest charge at least establishes that the officers had probable cause to arrest her for that offense.  *See Stryker v. City of Homewood*, 978 F.3d 769, 774 (2020).  They were thus authorized to use "some degree of physical coercion or threat thereof to effect" that arrest.  *Patel*, 959 F.3d at 1339 (quoting *Graham*, 490 U.S. at 396).  But resisting arrest is a misdemeanor in Alabama.  Ala. Code § 13A-10-41(b) (1975).  And the Eleventh Circuit recently reiterated that misdemeanor charges such as obstruction, disorderly conduct, and resisting arrest are "of minor severity" for purposes of assessing excessive force claims.  *Stryker*, 978 F.3d at 774 (quotation omitted); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) ("[R]esisting arrest without force does not connote a level of dangerousness that would justify a greater use of force.").  The first factor thus favors Haggard.

So do the second and third factors—whether Haggard posed an immediate threat or actively resisted.  Although Officer Bumpers testified that she believed Haggard was retrieving a knife when she barreled into Haggard's home and tackled Haggard, the facts, construed in Haggard's favor, do not support that belief.  Haggard

says she simply turned to face her husband when Officer Bumpers suddenly attacked her from behind without warning.  Turning one's back to a police officer by itself does not give the officer carte blanche to use excessive force.  Moreover, even if Haggard was retrieving a knife, it does not follow that she posed an immediate threat to the officers or Lee.  Officer Bumpers tackled Haggard when she had taken only a few steps toward another room while Lee was already at the door and had agreed to follow the officers outside.  Accordingly, there was no immediate need for Officer Bumpers to charge at Haggard and strike her in the face.  At a minimum, Officer Bumpers could have provided Haggard with a verbal warning.

Similarly, Haggard's version of the facts establish that she did not resist arrest before Officer Bumpers confronted her.  From Haggard's perspective, there was no opportunity to resist because Officer Bumpers ambushed her and immediately struck her in the face as she turned to face her attacker.  *Cf. Stryker*, 978 F.3d at 774–75.  Moreover, Haggard repeatedly denies attempting to push, punch, or swing at either officer that night.  Haggard acknowledges that she may have unintentionally touched an officer while falling after Officer Montgomery tased her, but that does not constitute resistance.  And even if an officer could have perceived Haggard as resisting when she turned toward Officer Bumpers or accidentally touched an officer as she fell,  those "minor transgressions [do] not mean that the force allegedly used was a constitutionally permissible response, or that [Officer Bumpers is] entitled to

qualified immunity." *Patel*, 959 F.3d at 1340 (alteration and quotation omitted).

The defendants respond with a procedural point. They argue that Haggard is precluded from denying that she resisted arrest because she pleaded guilty to doing so in state court. Doc. 35 at 16. This argument is unavailing because Haggard's resisting arrest conviction is general in nature and "sheds no insight into the sequence of events" underlying the conviction. *Stryker*, 978 F.3d at 774 n.1; *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008). Thus, the specific issue of whether Haggard was resisting when Officer Bumpers struck her was not "actually litigated in the prior action."[5] *Walker v. City of Huntsville*, 62 So.3d 474, 487 (Ala. 2010). Officer Bumpers' testimony, which Haggard disputes, that Haggard allegedly threatened and shouted profanities at her when Haggard arrived at the police station underscores that the precise moment Haggard resisted remains unclear despite the conviction. Doc. 36 at 105:14–107:17 (Ex. C).

The court next considers whether the amount of force Officer Bumpers used was proportionate to the situation at hand. The defendants string together more than

---

[5] The defendants state that whether an issue was "actually litigated" depends on the "precise wording of the previous judgment." Doc. 42 at 9. They also observe that in Alabama, a person resists arrest if she "intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of [herself] or of another person." Ala. Code § 13A-10-41 (1975). Allegedly, because Haggard has not disputed that this statutory language renders "actually litigated" whether she resisted, issue preclusion applies. Doc. 42 at 10. But the precise wording of the *judgment*— Haggard's resisting arrest conviction—as opposed to the statute, is opaque, stating only that "[o]n 5/31/19 the defendant appear[ed] in open court in person and plead[ed] guilty." Doc. 36 at 141 (Ex. D). Further, it is the defendants' burden to prove that an issue was determined in an earlier matter. *Walker*, 62 So.3d at 487.

two pages of case citations that purportedly prove their conduct proportionate and therefore reasonable. *See* doc. 35 at 20–22. But most of those cases are not binding precedent, and they all involve suspects who were resisting arrest, as the defendants themselves acknowledge. *See id.* at 20. Such cases are inapposite where, as here, a jury could reasonably find that Haggard was not resisting arrest based on her version of the facts.

In contrast, the Eleventh Circuit has "repeatedly ruled" that it violates the Fourth Amendment for officers to use "gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Patel*, 959 F.3d at 1339. The Circuit's decision in *Hadley v. Gutierrez* is instructive. There, an officer used excessive force when he punched a suspect in the stomach while the suspect was handcuffed and not resisting. 526 F.3d 1330. Because the suspect was compliant, even the officer's "single punch constituted excessive force." *Id.* Although the officer "might have subjectively believed" the suspect posed a danger because the suspect "was admittedly high on cocaine and paranoid," the officer's subjective beliefs were irrelevant because "excessive force is judged solely on an objective basis." *Id.* (citing *Graham,* 490 U.S. at 399).

Under *Hadley*, even if Officer Bumpers subjectively believed that Haggard was dangerous and intoxicated, her decision to strike Haggard in the face was excessive because Haggard was not resisting. True, the *Hadley* suspect was

15

handcuffed when the officer punched him.  But "the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing" but during an arrest.  *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 n.33 (11th Cir. 2017); *Patel*, 959 F.3d at 1340.  The Circuit decided *Hadley* in 2008 and *Stephens* in 2017, so it was clearly established that Officer Bumpers' actions were unconstitutional well before she struck Haggard gratuitously in January 2019.  *See Patel*, 959 F.3d at 1343 (observing that it has been clearly established in this circuit since at least 2000 that employing gratuitous force against compliant suspects violates the Fourth Amendment).

### b.

Haggard also contends that Officer Montgomery unconstitutionally tased her twice.  Only the first tasing is before the court at this juncture.  As to this incident, much of the analysis mirrors the court's discussion of Officer Bumpers' conduct.  As explained, Officers Montgomery and Bumpers ultimately arrested Haggard for a non-severe crime—misdemeanor resisting arrest.  And, based on her allegations, Haggard was neither a threat nor resisting when Officer Montgomery tased her the first time.  Rather, Haggard was already stumbling after Officer Bumpers attacked her without warning, struck her in the face, and shoved her.  The first three factors in the court's analysis therefore favor Haggard.

Next, the court compares the need for force to be applied to the amount of

force applied.  This proportionality analysis also cuts against Officer Montgomery.
Because a jury might reasonably find that Haggard was not resisting, it might also
find that it was gratuitous and excessive for Officer Montgomery to tase her even
once.  The Eleventh Circuit recently confirmed this in *Stryker v. City of Homewood*.
There, the Circuit decided whether an officer used excessive force when he shoved
and then tased a suspect in the back before kicking the suspect after he collapsed.
978 F.3d at 774.  Accepting as true the suspect's allegation that he never resisted or
berated the officer, the Circuit ruled that the "use of the taser by [the officer] was
objectively unreasonable."  *Id.* at 775.  The Circuit went on to explain that "at the
time of the incident" in 2014, "it was clearly established that using violent force
generally, and a taser specifically, on a compliant, nonaggressive, and
nonthreatening misdemeanant violates the Fourth Amendment."  *Id.*

The defendants cite *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), for
the proposition that "the use of a taser to effectuate an arrest [does] not constitute
excessive force when the suspect repeatedly resisted."  Doc. 35 at 20.  In *Draper*,
the Eleventh Circuit deemed it reasonable for an officer to tase a suspect once in the
chest when the suspect was "hostile, belligerent, and uncooperative."  369 F.3d at
1278.  But the defendants' reliance on *Draper* again assumes that Haggard resisted,
which she emphatically denies, and that her resisting arrest conviction precludes
litigation of this issue, which it does not.  *Draper* is therefore markedly inapplicable

to the present facts, at least as Haggard alleges them.  "Nothing in *Draper* supports the view that tasing a cooperative, nonthreatening misdemeanant . . . is an appropriate means of effecting an arrest."  *Stryker*, 978 F.3d at 775.  Instead, since deciding *Draper*, the Circuit has "explicitly held—and thus clearly established— that employing a taser on a compliant, nonthreatening suspect violates the Constitution."  *Id.* (citing *Fils*, 647 F.3d at 1288–89).

## 2.

Finally, under Eleventh Circuit precedent, the "application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).  The court will thus consider the severity of Haggard's alleged injuries.  In her complaint, Haggard alleges that she suffered "humiliation and shame and mental distress" because the officers used excessive force to arrest her.  Doc. 19 at 5–6.  She says the officers' force was particularly humiliating and distressing because it occurred before her children.  Doc. 36 at 68:5–10, 69:1–20.  Additionally, Haggard testified that her eye became "black and kind of swol[len]" after Officer Bumpers struck her in the face.  Doc. 36 at 174:21–23 (Ex. A); *see also* doc. 37 at 4 (Ex. H).  Haggard also claims damages for the physical pain she suffered during the confrontation.  *Id.* at 67:1–22 (Ex. A).

The defendants contend that these injuries are de minimis and that the degree

of force they used was thus reasonable.  Doc. 42 at 10; *see also* doc. 35 at 23.  They are perhaps correct in the abstract, but certainly not here, where Haggard never resisted.  The de minimis "principle has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat."  *Saunders v. Duke*, 766 F.3d 1262, 1269–70 (11th Cir. 2014).  A suspect who is "gratuitously beaten" is not barred from pursuing an excessive force claim against the offending officers simply because she "has the good fortune to escape without serious injury."  *Id.* at 1270 (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 38–39 (2010)).

The defendants cite two unpublished Eleventh Circuit decisions to show otherwise.  Neither helps their cause.  For starters, *Riggins v. Beseler*, 568 F. App'x 850 (11th Cir. 2014)—which held that a plaintiff who was tased could not show a constitutional violation because "he failed to submit any evidence that his injuries were more than de minimis"—was a prisoner case involving the Eighth, not the Fourth, Amendment.  *Id.* at 853.  Moreover, even if *Riggins* were a Fourth Amendment excessive force case, it would be distinguishable because the prisoner there was aggressive and noncooperative, whereas Haggard was not.  *See id.*

Another case, *Woodruff v. City of Trussville*, 434 F. App'x 852 (11th Cir. 2011), is factually better for the defendants.  In *Woodruff*, the Circuit observed that an officer used de minimis force when he punched a drunk driving suspect in the

face, removed him from his car, and slammed him to the ground.  *Id.* at 855.  But "*Woodruff* is an unpublished opinion," and in the Eleventh Circuit, "unpublished decisions, with or without opinion, are not precedential and they bind no one." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1327 n.31 (11th Cir. 2017) (quotation omitted).  Moreover, *Woodruff* relied on *Nolin*, 207 F.3d 1253, which the defendants also cite in passing.  Doc. 42 at 10.  *Nolin* concluded that an officer used de minimis force when he shoved the plaintiff against a van, kneed him in the back, pushed his head against the van, and uncomfortably searched and handcuffed him.  207 F.3d at 1258.  Because the officer's force resulted only in minor bruising, the plaintiff's claims were nonactionable.  *Id.*  *Nolin* explicitly distinguished, however, cases involving arrests "in which *any* use of force was inappropriate."  *Id.* (emphasis added).  The cases *Nolin* distinguished involved arrests lacking probable cause.  *See id.*  But the Eleventh Circuit has likewise explained that officers are "not entitled to use *any* force" against one who has "neither resisted arrest nor posed a danger." *Hadley*, 526 F.3d at 1330 (emphasis added).  Accordingly, Haggard has alleged constitutionally cognizable injuries.

## IV.

To close, the defendants are not entitled to summary judgment based on qualified immunity.  The facts, construed in Haggard's favor, show that a reasonable jury could find that the defendants used gratuitous and excessive force in violation

20

of clearly established constitutional law.  Although the defendants' version of events differs dramatically from Haggard's, such factual disputes must be resolved at trial rather than summary judgment.  The defendants' motion for summary judgment, doc. 34, is thus **DENIED**.

 **DONE** the 23rd day of November, 2020.

        _____

        **ABDUL K. KALLON**
       UNITED STATES DISTRICT JUDGE